IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

HOME INDEMNITY COMPANY,

    Plaintiff,

vs.                                                    Civ. No. 97-1411 WWD/LFG

SANDERS, BRUIN, COLL & WORLEY, P.A.,
et al.,

    Defendants.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court upon Plaintiffs' Motion for Summary Judgment, or in the Alternative, for Partial Summary Judgment, filed May 13, 1998 [28-1].   In this declaratory judgment action, Plaintiff, an insurance company, seeks summary judgment against Defendants who are partners in a law firm, based on alleged misrepresentations made in the insurance application.

Plaintiff ("The Home") seeks summary judgment on the following issues:

1.     A determination that because of material misrepresentations and omissions made by Defendants ("SBCW") in their application for legal malpractice insurance, Plaintiff should be entitled to rescind or reform the insurance policy issued to Defendants by Plaintiff;

2.     A determination that there is no coverage under the insurance policy in question since the malpractice claim by McKay against Defendants was made before the insurance policy issued by plaintiff was in effect;

3.     A determination that if there is coverage under the policy, then the "each claim" proviso of the policy limits the coverage in connection with the McKay claim to a total of $500,000.00;

4.     A determination that the insurance policy in question provides no coverage for an award of punitive damages against Defendants;

    5.    A determination that Plaintiff is obligated under its insurance policy with Defendants to furnish one, and only one, defense counsel, to provide a joint defense for Defendants in the malpractice actions brought against Defendants.

**Legal Standards**

In making a determination on a motion for summary judgment, a court does not weigh the evidence, but rather asks whether a reasonable jury could return a verdict for the nonmoving party, in this case the Plaintiff, on the undisputed material evidence before the court. The non-moving party must present enough evidence to allow a reasonable jury to find for the non-moving party, and cannot rest upon mere allegations or denials of the pleadings. Orback v. Hewlett-Packard Co., 97 F.3d 429, 432 (10th Cir. 1996) (citing Wilson v. Meeks, 52 F.3d 1547, 1551-52 (10th Cir. 1995)). Further, the court must consider all the evidence in the light most favorable to the nonmoving party. Dreiling v. Peugot Motors of America, Inc., 850 F.2d 1373, 1377 (10th Cir. 1988).

The parties' briefs do not raise any conflict of law issue. Nevertheless, because this case is premised on diversity jurisdiction, New Mexico substantive laws apply. State Farm Mutual Automobile Ins. Co. v. Blystra et al., 86 F.3d 1007, 1010 (10th Cir. 1996) (applying New Mexico to declaratory judgment action involving uninsured motorist claim); Resolution Trust, 840 F.Supp. 1463, 1479 (D.N.M. 1993) (citing Erie v. Tompkins, 304 U.S. 64, 78 (1938)).

**1. Rescission or Reformation of the Insurance Contract**

The Complaint alleges that SBCW[1] concealed or failed to disclose material information in response to specific questions on the applications, including information which SBCW knew or

---

[1] "SBCW" refers to the partnership and individual attorney-shareholder defendants unless otherwise specified.

reasonably should have known might have been expected to be the basis of a claim or suit against it. The Home seeks to rescind the insurance policy ("the Policy") it issued to Defendants with a declaration that it is void *ab initio*. Compl. at 2, ¶ 3.  The missing information concerns letters by SBCW's clients, specifically, McKay Oil corporation, Roy L. McKay, Charolotte McKay, or the McKay Living Trust (hereinafter referred to collectively as "McKay" or "McKay clients").[2]

*Background*

SBCW represented McKay in various legal matters, including the defense in substantial litigation brought by Royal Petroleum Corporation. The final arbitration hearing in this litigation was initially scheduled for the latter part of October, 1992. In a letter dated September 16, 1992, Defendants indicated that were immediately withdrawing as McKay's attorneys. Pltff's Mem., Ex. 3. McKay responded in a letter dated September 18, 1992, which protested the withdrawal only six weeks before an arbitration involving large sums of money. After pointing out the difficulties in proceeding with the arbitration with new counsel as well as the failure of Defendants to give any basis for their actions, McKay stated:

> It is without question that your withdrawal a this time could financially ruin me and will wrongfully expose me to a potential judgment of  $18 million dollars. This letter is to notify you as a law firm and individually that I will look to you for  recovery of any and all damages resulting from your untimely and illegal withdrawal.
>
> (Pltff's Mem., Ex. 4)

---

[2] Proceedings on issues providing the impetus for the present action are currently pending in state court in several actions ("underlying actions"), based on SBCW's allegedly wrongful withdrawal from representation. See, e.g., Sanders, Bruin, Coll & Worley, P.A. v. McKay Oil Corp. et al, 123 N.M. 457 (1997).

After SBCW withdrew and McKay had retained new counsel, SBCW sent its final bill for services to McKay.  McKay responded to Defendants in a second letter dated February 3, 1993, questioning the bill and stating as follows:

> . . . [I]t appears to me that you may be using Damon as a ploy to reduce your liability exposure for your illegal withdrawal as my counsel.  With the arbitration hearing going much longer then initially contemplated, I do not have time to be playing this game.  I believe that what you have done is illegal and unethical.  When this case is over with, I have been urged by several other attorneys to pursue handling this matter through the Disciplinary Board of the New Mexico State Bar Association and the Court System.
>
> ***
>
> My family and myself have been hurt deeply by your continued deceitful action at this most difficult time in our lives.  This, of course, does not even begin to cover the financial difficulty that you have placed me in.
>
> (Pltff's Mem., Ex. 5)

As of February 18, 1994, the date Defendants submitted the application for insurance, no further activity is reported in connection with the letters mentioned above, and almost year had elapsed since McKay had prevailed in the arbitration hearing.  Mem. in Opp., Ex. B at 2.[3]

Item 11d of the application to Plaintiff reads as follows:

> Does any lawyer named in Question 5(a) know of any circumstances, acts, errors or omissions that could result in a professional liability claim against any attorney of the firm, the firm, or its predecessors?

Two boxes, one indicating "NO" and the other "YES" follow the question.  Defendants checked the box for "NO."  If the answer were "YES", the form continues: "Please give full details for EACH INCIDENT by attaching Supplemental Claim Form."  Item 11c of the application asks:

> During the past 10 years, has any professional liability claim or suit ever been made against any lawyer of a predecessor firm?

---

[3] The final arbitration hearing had been delayed until January 1993.  Pltff's Mem., Ex. 6 at 4.

4

Again, two boxes, one for "YES" and one for "NO" follow the question. Defendants checked the box for "YES." If the answer were "YES", the form continues: "Please give full details on Supplemental Claim Form." The Supplemental Claim Information attached gives information concerning two other clients; however, no reference is made to any claim by the McKay clients (hereinafter referred to collectively as McKay).  Pltff's Mem., Ex. 8.

*Discussion*

Recission of a contract is generally allowed where there has been a "misrepresentation of a material fact, the misrepresentation was made to be relied on, and has in fact been relied on." Golden Cone Concepts, Inc. v. Villa Linda Mall, Ltd., 113 N.M. 9, 14 (1991) (citing Modisette v. Foundation Reserve Ins. Co., 77 N.M. 661, 666 (1967)). Again generally speaking, the good faith with which the misrepresentation is made is immaterial. Prudential Ins. Co. of America v. Anaya, 78 N.M. 101, 103 (1967) (citing Modisette at 666); Wilburn v. Stewart, 110 N.M. 268, 270 (1990) (even innocent misrepresentation of a material fact will entitle the party who has justifiably relied on that fact to rescind the contract). Thus, The Home could rescind the contract if it relied on misrepresentations or omissions by SBCW, regardless of whether Defendants acted fraudulently, negligently or innocently. Id. (various citations omitted).[4]

Under the Policy, "Claim" is defined as follows:

Claim, whenever used in this policy, means a demand received by the Insured for money or services, including the service or suit or institution of arbitration proceedings against the insured.

---

[4] For this reason, Plaintiff's claim for breach of duty is not relevant here. See, e.g., Tsosie v. Foundation Reserve Ins. Co., 77 N.M. 671, 677-78 (1967) (Chavez. J., conc.) (because it makes no difference whether the party making the misrepresentation or withholding the information acted innocently or intended to deceive, the controlling question is that of the materiality of the misstatement).

Pltff's Mem., Ex. 8 (Sec. B, "Coverage").  Viewing the two McKay letters in a light most favorable to Defendants, a fact-finder could reasonably find that the letters voiced dissatisfaction with Defendants' conduct and even a serious concern regarding Defendants' ethics, but that they did not constitute a "claim" as defined under the Policy and within the inquiry set out in Item 11c.

Similarly, a jury could find that omitting the McKay letters under item 11d was not an act, error or omission that could result in a professional liability claim such that withholding this information was a misrepresentation.  Since McKay's "look to recover" language in his letter of September 18, 1992, is logically linked to the then pending arbitration with its threat of a sizable judgment against McKay, the fact that McKay prevailed in the arbitration together with the passage of time after the arbitration is significant.  In fact, the malpractice "claim" by McKay did not unconditionally appear until September of 1994, when McKay, who had been sued by Defendants for legal fees, made a malpractice counterclaim.

Even assuming that SCBW acted improperly in withholding information about McKay, I still find that enough disputed facts exist concerning the other elements required in a misrepresentation claim to withstand Plaintiff's summary judgment motion.  It is not undisputed that this information was either material or relied upon by Plaintiffs.  A misstatement is material if it "operates as an inducement to the insurer to enter into the contract, where except for such inducement, it would not have done so, or would have charged a higher premium." Modisette, 77 N.M. at 667; Anaya, 78 N.M. at 104 (misstatement is material if it takes away insurer's opportunity to estimate its risk under the contract).  Plaintiffs here have the burden to establish the materiality of the omission.  Rael v. American Estate Life Ins. Co., 79 N.M. 379, 381 (1968).

Other than the allegations in the Complaint, I see no evidence which satisfies that burden.[5] Because the question of materiality is one of fact, Modisette at 667, it also remains as a disputed issue reserved for trial.

*Waiver / Estoppel*

SBCW also argues that The Home has waived and/or should be estopped from asserting its coverage defense. Because I do not find as a matter of law that there was misrepresentation by Defendants, they are not prevented at this point from invoking an equitable defense. See United States v. Louisiana -Pacific Corp., 622 F.Supp. 1122, 1137 (D.Colo. 1987) (party barred from asserting equitable defense by doctrine of "clean hands").

However, the waiver or estoppel defense is of no avail here because Plaintiff reserved its right to deny coverage. See American Gen. Fire & Casualty Co. v. Progressive Casualty Co., 110 N.M. 741 (1990) (liability insurer that assumes defense of insured with knowledge of possible grounds for noncoverage and does not reserve its right to later deny coverage, is precluded from later asserting that no coverage exists). SBCW contends that The Home's initial reservation of rights letter, dated April 6, 1995 (Mem. in Opp., Ex. A at 2), referred only to coverage issues related to punitive damages and policy limits. SBCW further supports its position by stating that at the time Home undertook to defend SBCW, it knew about McKay's September 18, 1992 letter since it was attached to the Complaint and Counterclaim in the underlying action. Worley Aff. at 2. Nevertheless, Plaintiff's initial letter made clear that it was not only reserving rights concerning

---

[5] Cmp.., Moseley v. Nat'l Bankers Life Ins. Co., 66 N.M. 330 (1959) (insurer failed to show proof that any false statement in application that acceptance of the risk assumed had been materially affected); Tsosie, 77 N.M. at 675 (where insurer could not satisfy burden of proof concerning materiality, insurer not allowed to cancel where insurer's conduct would not have been altered in either accepting the risk, or in the premium that would have been charged).

punitive damage awards and policy limits, but also "*all* of its rights with respect to coverage." (emphasis added).  Mem. in Opp. Worley Aff., Ex. A at 2.

**2.  Coverage - Whether the Claim Antedated the Insurance Policy**

Alternatively, Plaintiff seeks reformation of the insurance contract to exclude coverage with no obligation to defend or indemnify, contending that the allegations made in the underlying actions arose out of claims made prior to the policy period.  Compl., ¶¶ 5, 6; see State v. Garley, 111 N.M. 383, 387 (1991) (reformation of only a part of a contract permissible on grounds of either mistake or misrepresentation).

The Home Policy provides coverage for acts, errors or omissions occurring prior to the Policy Period (i.e., prior to March 1, 1994) where the insured "had no reasonable basis to believe that the Insured had breached a professional duty or to foresee that a claim would be made against the Insured."  Ex. 8 Home Policy at 1, Sec. BI(b).   Plaintiff contends the underlying claims fall outside of the scope of coverage because the McKay letters gave SBCW both a reasonable basis to believe that SBCW had breached a professional duty owed to McKay and a reasonable basis to foresee a claim.

However, given the way "claim" is defined under the Policy, a reasonable jury could find that the  McKay letters were not a claim against Defendants.  Defendants also did not disclose this information to the SBCW's former carrier during the time the letters were generated, based on SBCW's belief that the letters did not represent potential malpractice claims.  Mem. in Opp., Ex. B at 3-4.

Moreover, I have referred above to the chronology of the Defendant's withdrawal from McKay's representation, McKay's response to the withdrawal, the outcome of the feared arbitration, and the date of the insurance application.  Since I have indicated that McKay's September 1992 letter arguably is at most a conditional claim based on the outcome of the prospective arbitration, I find that here again is a material disputed fact which precludes my finding as a matter of law that the present claim was made outside the policy period.[6]

Thus, summary judgment should be denied as to Plaintiff's entitlement to reform the Policy to exclude coverage for the underlying claims as well as a judicial declaration that the claim in question was made outside the period covered by the insurance policy.

### 3.  "Each Claim" Provision - Policy Limits

In the event coverage is found, Plaintiff seeks a judicial declaration that the "each claim" provision of the Policy limits coverage of the McKay claim to a total of $500,000.00.   The language pertinent to this issue appears under the heading "IV. Multiple Insureds, Claims, and Claimants" and states in part at page 6 of the Policy the following language:

> The inclusion herein of more than one insured or the making of claims or the bringing of suits by more than one person or organization shall not operate to increase the Company's limit of liability.  *Related acts, errors, or omissions shall be treated as a single claim.*  (Emphasis added).

On the "Declarations" page of the policy under "Item 4 -  Limit of Liability" the amount set for a limit on "Each Claim" is $500,000.00; and the "Aggregate'' limit is $1,000,000.00.   Defendants

---

[6] Even as of the second letter in February 1993, McKay's displeasure was tied into the upcoming arbitration hearing.  Pltff's Mem., Ex. 5 at 2. ("As of this date, I have not decided what to do, mainly because of the stress of the additional financial burden of bringing in another law firm at this late hour and the pure stress of the hearing.").

9

argue that a claim is made against each individually named Defendant as well against the corporate Defendant, and that the available coverage with respect to the McKay claim(s) should be $1,000,000.00.

The court's role is to interpret and enforce a contract as written by the parties. Boatwright v. Howard, 102 N.M. 262, 264 (1985). In New Mexico, "clear and unambiguous" contract provisions are conclusive." Awbrey v. Pennzoil Co., 961 F.2d 928, 930 (10th Cir. 1992); accord, Bank of New Mexico v. Sholer, 102 N.M. 78, 79 (1984). The Policy does not define the phrase "related acts, errors or omissions." Neither has my research unearthed any helpful New Mexico case. Several other courts have found the term "related" in similar policy language to be ambiguous. See St. Paul Fire & Marine Ins. Co. v. Chong, 787 F. Supp. 183, 186 (D. Kan. 1992) (numerous citations omitted). Because I also find the language to be ambiguous, the provision must be construed in favor of the Defendants. Federal Ins. Co. v. Century Fed. Sav. & Loan Ass'n, 113 N.M. 162, 167, 824 P.2d 302, 307 (1992); C.R. Anthony Co. v. Loretto Mall Partners, 112 N.M. 504, 509 (1991) (whether an agreement contains an ambiguity is a question of law). Such a construction would necessarily preclude summary judgment for Plaintiff.

A general rule which proves useful here is one which defines a separate "occurrence" as being "determined by the cause or causes of the resulting injury." Business Interiors, Inc. v. Aetna Casualty & Surety Co., 751 F.2d 361, 363 (10th Cir. 1984). In other words, the inquiry considers the number of causative acts, not the number of resulting injuries. See, e.g., Home Indemnity Co. v. City of Mobile, 749 F.2d 659 (11th Cir. 1984) ("occurrence" defined as each discrete act or omission by City which caused flooding and property damage); Ariz. Prop. & Casualty Ins. Guaranty Fund v. Helme, 735 P.2d 451, 457 (Az 1987). Some courts which have determined that

the phrase was not ambiguous, nevertheless follow a similar construction.  See, e.g., American Commerce Ins. Brokers v. Minn. Mutual Fire & Casualty Co., 551 N.W.2d 224 (Minn. 1996) (acts of embezzlement which follow each other in time, take place at the same business, and are committed by the same employee are not "related" as that word is commonly used); Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins.Co., 855 P.2d 1263 (Cal. 1993) (concluding that the attorney's failure to file a complaint to foreclose a mechanic's lien and to serve a stop notice on construction project's construction lenders were related in multiple respects because they arose out of the same transaction, were committed by the same attorney, and resulted in the same injury).

In this case, the act which gave rise to the malpractice claim against the Defendants was the letter of September 16, 1992, withdrawing from their representation of McKay.  Each partner except Damon Richards signed the letter announcing the withdrawal, and Richards later ratified the action announced in the letter.  The distinguishing feature of Defendants' conduct which is critical in construing the Policy provision is that the "acts, errors or omissions" were carried out individually by several different shareholders.  Each signing of the September 16, 1992 letter by the individual SBCW attorneys could thus be considered a separate (or discrete) act or omission.  Moreover, these acts can be seen as unrelated based on a lack of causal connection each signing had to the other.  Ariz. Prop. & Casualty, 735 P.2d  451 (causal connection defined in that one error caused the other, not that the opportunity to commit the errors arose out of the same cause).  American Commerce Ins. Brokers, 551 N.W.2d at 228 ("related acts" must be causally related).

Thus, the alleged acts or omissions of each individual shareholder could reasonably be viewed as a separate "claim" for purposes of determining the limits of liability under the Policy.  Also, the holding of the New Mexico Supreme Court that the SBCW attorneys-shareholders would

11

not be shielded by incorporation from personal liability for their participation in the termination bolsters this interpretation. See note 2, below. Because the phrase governing the limits of Plaintiff's liability under the Policy is ambiguous, and a construction exists that would allow reasonable minds to view the conduct of the Defendants as constituting more than one act, error or omission, summary judgment is denied.[7]

**4. Availability of Punitive Damages under Policy**

Plaintiff contends that punitive damages are excluded from coverage by the language in its policy, and that it is entitled to a declaration by the Court to that effect. Defendants point out that the punitive damages issue appears to be near death in the underlying actions, making the issue near-moot. With the issue lying in the hospice of a motion for reconsideration, I do not see it as an imminent threat to either party to this action. See Worley Aff. at ¶ 15 (Defendants granted partial summary judgment from the bench on McKay's punitive damages claims in underlying case).

Also, Defendants' position that the policy language does not necessarily exclude every situation where punitive damages could be awarded against Defendants is well-taken. Plaintiff incorrectly assumes that any award of punitive damages against Defendants would be based on conduct which comes within the exclusionary language in the provision. Ex. B, Policy Provisions, Sec. C. Although a wrongdoer in a tort action must have some culpable mental state, Clay v.

---

[7] Defendants argue that Plaintiff should be waived or estopped from asserting its position that the McKay litigation constitutes a single claim. They base this argument on Plaintiff's waiting eighteen months after Defendants had made a $1,000,000.00 coverage contention in a letter before Plaintiffs asserted the limits set out in its policy. Defendants assert that they were prejudiced by their reliance on their belief that the coverage was $1,000,000.00, However, I see no action by Plaintiff which estops Plaintiff from relying on the terms of policy. The failure of Plaintiff's position stems from the language in the provision rather than any estoppel theory.

Ferrellgas, Inc., 118 N.M. 266, 269 (10th Cir. 1994), a finding of gross negligence is still a sound basis for awarding punitive damages but is not listed in the exclusionary language. See Ruiz v. Southern Pacific Transp. Co., 97 N.M. 194, 201 (Ct.App.1981), cert. quashed, 97 N.M. 242 (1981).[8]  Accordingly, summary judgment is denied on this issue.

**5. Entitlement to Separate Counsel**

Defendants contend that each of them is entitled to separate counsel because of potential conflicts between them. Plaintiff cites the following three provisions of its policy in support of its position that it only has to appoint one attorney to represent all the Defendants including the professional corporation:

> With respect to the insurance afforded by this policy, the Company shall defend any claim against the Insured including the appeal thereof seeking damage consent to which this insurance applies even if any of the allegations of the suit are groundless, false, or fraudulent.
> (Ex.8 – Home Policy at 2)

> Claim expenses, whenever used in this policy, means:
> (a) Fees charged by any lawyer designated by the Company:
> (b) All other fees, costs and expenses resulting from the investigation, defense and appeal of the claim, if incurred by the company.
> (Ex. 8 - Home Policy at 7)

> The insured shall not, except at the Insured's own cost make any payment, admit any liability, settle any claims, assume any obligation or incur any expense without the written consent of the company.
> (Exhibit 8 – Home Policy at 7)

Plaintiff stretches the control set out in the policy sections above into the conclusion that "[c]learly, the Home Policy authorizes the Home to appoint a single defense counsel on behalf of ...[the

---

[8] Neither "wanton conduct" nor "gross negligence" concerns conduct that is carried out with "utter indifference" rather than intentionally. N.M.Civ. UJI 13-1827.

professional corporation] and the ...attorneys." Pltff's Mem. at 21.   Control of the litigation does not mean that the Plaintiff can exercise such control as to make a mockery of the contractual promise of representation.

I am not convinced that five lawyers, steeped in the professional caldron where controversies are so often seasoned with real and imagined conflicts, can be represented effectively by one lawyer in this particular situation.  The law firm of Rodey, Dickason, Sloan, Akin & Robb was allowed to withdraw from representation of the individual shareholders following the state Supreme Court's reversal of summary judgment which left the five SBCW shareholders individually liable for their conduct.  Mem. in Opp. Exs. J & K.   There was a concern that the interests of the Defendants had become adverse to each other in that each Defendant has an individual interest to eliminate or reduce his comparative fault which could in turn affect the fault attributable to the other Defendants.  It was also acknowledged that personal exposure was a danger with the possibility that claims in the underlying case may exceed available insurance.  See Ex. H at 2; Ex. I.   I find these concerns to be appropriate.

Comparative fault contemplates apportionment of fault after each Defendant's participation in the particular wrong is analyzed.  Even if joint and several liability applied in the underlying case,[9] proportionate fault would still be an issue, although it would affect only equitable contribution and not liability.  Gallegos v. Citizens Ins. Agency, 108 N.M. 722, 727 (1989); see N.M.Stat.Ann. 54-1A-306 (joint and several liability among partners).

---

[9] The McKay Plaintiffs in the underlying litigation have apparently taken this position. Worley Aff. at 8.

14

The single case cited to support Plaintiff's position is <u>Spindle v. Chubb/Pacific Insurance Group</u>, 152 Cal. Rptr. 776 (Ct. App. 1979.)  <u>Spindle</u> was a bad faith claim against the insurer of two physicians by those physicians based on the fact that the insurance company, in the absence of any apparent conflict of interest, had one law firm represent both doctors in a medical malpractice suit.  Part of the rationale in finding no bad faith was the statement by the insurer that such representation would be proper because there was no apparent conflict of interest between the two physicians.

I do not see how one lawyer can juggle five balls at the same time; at least, I have not seen such a lawyer yet.  In short, I am not willing to impale five New Mexico lawyers on a California Spindle.  The positions of the individual Defendants are sufficiently adverse so that representation by one lawyer may be rendered less effective because of representation of the others.  I find that the Policy language is not determinative of whether each Defendant is entitled to separate counsel and that the issue involves a genuine issue of disputed fact.  Accordingly, this portion of Plaintiff's motion for summary judgment should also be denied.

**WHEREFORE,**

**IT IS ORDERED** that Plaintiffs' Motion for Summary Judgment, or in the Alternative, for Partial Summary Judgment [28-1], is hereby **denied** on all issues raised.

_____
UNITED STATES MAGISTRATE JUDGE